**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **3:12-cr-00178-MO** |
| | **(3:17-cv-01559-MO)** |
| **Plaintiff,** | |
| | **OPINION AND ORDER** |
| **v.** | |
| **CHRISTOPHER ADIN GRAHAM,** | |
| **Defendant.** | |

**BILLY J. WILLIAMS**
United States Attorney
**LEAH K. BOLSTAD**
Assistant United States Attorney
1000 S.W. Third Avenue
Suite 600
Portland, OR 97204
(503) 727-1000

            Attorneys for Plaintiff

**BEAR WILNER-NUGENT**
620 S.W. Fifth Avenue
Suite 1008
Portland, OR 97204
(503) 351-2327

            Attorney for Defendant

1 - OPINION AND ORDER

**MOSMAN, Judge.**

This matter comes before the Court on Defendant Christopher Adin Graham's Motion (#183) to Vacate, Set Aside, or Correct the Sentence Pursuant to 28 U.S.C. § 2255.

For the reasons that follow, the Court **DENIES** Defendant's Motions and **DECLINES** to issue a certificate of appealability.

<u>BACKGROUND</u>

On December 19, 2011, a Multnomah County Grand Jury indicted Defendant Christopher Adin Graham with Compelling Prostitution, Promoting Prostitution, Assault in the Second Degree, Assault in the Fourth Degree, and Tampering with a Witness.  At some point during the course of the state case, Deputy District Attorney (DDA) Glen Ujifusa made Defendant a settlement offer of 120-month term of imprisonment without any reductions.  Defendant received and rejected the settlement offer.

In April 2012 the State dismissed the charges against Defendant.

On April 17, 2012, a federal grand jury indicted Defendant with one count of Sex Trafficking by Force, Fraud, and Coercion in violation of 18 U.S.C. §§ 1591(a)(1) and (b)(1) and 18 U.S.C. § 1594(a) and two counts of Tampering with A Witness, Victim, or Informant in violation of 18 U.S.C. § 1512(b)(3).

On April 19, 2012, the Court appointed Assistant Federal

Public Defender (AFPD) T.J. Hester to represent Defendant.

After his appointment AFPD Hester began negotiating a federal plea offer that would mirror the 120-month plea offer made to Defendant in the state proceedings. On November 19, 2012, Hester negotiated with DDA Ujifusa for a "calibrated" plea offer of 137 months based on differences between state and federal sentencing structures and, in particular, federal good-time credits. Pl.'s Resp., Ex. 1. Defendant, however, rejected the offer.

On December 28, 2012, AFPD Hester filed a Motion to Withdraw as Attorney.

On January 15, 2013, the Court granted AFPD Hester's Motion and appointed Krista Shipsey as Defendant's attorney.

After her appointment Shipsey asked the government to keep the offer negotiated by AFPD Hester "on the table." The government agreed to do so. On June 18, 2013, Assistant United States Attorney (AUSA) Scott Kerin and DDA Ujifusa provided Defendant with a formal plea offer for 139 months. Shipsey states in her Declaration that she presented the offer to Defendant and

> highlight[ed] several important issues. One, he
> had a significant prior conviction for the same
> type of behavior where he received a ten year
> sentence. Second, in federal court he was charged
> with a crime that carried a mandatory 15 year
> minimum and the government was willing to offer an
> amount below the minimum. Third, based on the
> investigation that had already been done, it

> appeared that the victim was cooperating
> extensively and would be prepared to testify
> against [Defendant]. . . .  I explained to him
> very clearly, that he was being given a 10 year
> offer, it was a very reasonable settlement
> proposal and I felt strongly that he should take
> the deal.

Decl. of Krista Shipsey at ¶ 1.  Defendant, however, "did not waiver in declining the offer."  *Id.*

At some point after August 2013 attorney Gareld Gedrose began assisting Shipsey with Defendant's case.  Gedrose had heart surgery in August 2013.  After surgery and while Gedrose was in a rehabilitation center, Shipsey sent him "motions, research etc. regarding the Graham case.  [Shipsey] visited him almost daily and [they] discussed the case.  Although [Gedrose] appeared limited physically . . . it did not appear to [Shipsey] that he had any cognitive limitations."  Shipsey Decl. at ¶ 2.

On December 10, 2013, the Court appointed Gedrose "as second chair co-counsel" for Defendant.

After a six-day trial beginning March 3, 2014, the jury found Defendant guilty on all counts of the Indictment on March 11, 2014.

On March 14, 2014, Defendant filed a Notice of Appeal to the Ninth Circuit.

On September 25, 2014, the Court sentenced Defendant to a concurrent term of 60 months imprisonment on Counts 2-3 and a consecutive term of 300 months imprisonment on Count 1 for a

total of 360 months imprisonment.  On September 26, 2014, the
Court entered a Judgment.

On September 29, 2014, Defendant filed a second Notice of
Appeal to the Ninth Circuit.

On April 12, 2016, the Ninth Circuit entered a Final
Judgment and Mandate in which it affirmed Defendant's conviction
and sentence.

On June 16, 2016, Defendant filed a Petition for Writ of
Certiorari to the United States Supreme Court.

On October 3, 2016, the Supreme Court denied Defendant's
Petition for Writ of Certiorari.

On October 2, 2017, Defendant filed a Motion to Vacate, Set
Aside, or Correct the Sentence Pursuant to 28 U.S.C. § 2255 on
the ground of ineffective assistance of counsel.  The Court took
Defendant's Motion under advisement on March 16, 2018.

## STANDARDS

28 U.S.C. § 2255 provides in pertinent part:

> A prisoner in custody under sentence of a court
> established by Act of Congress claiming the right
> to be released upon the ground that the sentence
> was imposed in violation of the Constitution or
> laws of the United States, or that the court was
> without jurisdiction to impose such sentence, or
> that the sentence was in excess of the maximum
> authorized by law, or is otherwise subject to
> collateral attack, may move the court which
> imposed the sentence to vacate, set aside or
> correct the sentence.

* * *

> If the court finds that the judgment was rendered
> without jurisdiction, or that the sentence imposed
> was not authorized by law or otherwise open to
> collateral attack, or that there has been such a
> denial or infringement of the constitutional
> rights of the prisoner as to render the judgment
> vulnerable to collateral attack, the court shall
> vacate and set the judgment aside and shall
> discharge the prisoner or resentence him or grant
> a new trial or correct the sentence as may appear
> appropriate.

Although "the remedy [under § 2255] is . . . comprehensive, it does not encompass all claimed errors in conviction and sentencing. . . . Unless the claim alleges a lack of jurisdiction or constitutional error, the scope of collateral attack [under § 2255] has remained far more limited." *United States v. Addonizio*, 442 U.S. 178, 185 (1979).

## DISCUSSION

Defendant moves to vacate his conviction and sentence on the ground that he received ineffective assistance of trial counsel. Defendant also requests an evidentiary hearing.

The government asserts Defendant's Motion should be denied on the merits.

## I.  Standards

The Supreme Court has established a two-part test to determine whether a defendant has received constitutionally deficient assistance of counsel. *Premo v. Moore*, 131 S. Ct. 733, 739 (2011). *See also Strickland v. Washington*, 466 U.S. 668, 678, 687 (1984). Under this test a defendant must not only prove

counsel's assistance was deficient, but also that the deficient performance prejudiced the defense. *Premo*, 131 S. Ct. at 739. *See also Sexton v. Cozner,* 679 F.3d 1150, 1159 (9th Cir. 2012); *Ben-Sholom v. Ayers*, 674 F.3d 1095, 1100 (9th Cir. 2012).

"To prove deficiency of performance, the defendant must show counsel made errors so serious that performance fell below an objective standard of reasonableness under prevailing professional norms." *Mak v. Blodgett*, 970 F.2d 614, 618 (9th Cir. 1992)(citing *Strickland*, 466 U.S. at 687-88)). *See also Sexton*, 679 F.3d at 1159 (citing *Premo*, 131 S. Ct. at 739). The court must inquire "whether counsel's assistance was reasonable considering all the circumstances" at the time of the assistance. *Strickland*, 466 U.S. at 688. *See also Detrich v. Ryan*, 677 F.3d 958, 973 (9th Cir. 2012). There is a strong presumption that counsel's assistance was adequate. *Strickland,* 466 U.S. at 689. *See also Sexton*, 679 F.3d at 1159.

To prove prejudice "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. *See also Sexton*, 679 F.3d at 1159-60. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 695. *See also Sexton*, 679 F.3d at 1160.

The court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." *Strickland,* 466 U.S. at 697. *See also Heishman v. Ayers*, 621 F.3d 1030, 1036 (9th Cir. 2010). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland,* 466 U.S. at 697. *See also Heishman*, 621 F.3d at 1036.

## II. Analysis

As noted, Defendant moves to correct his sentence on the ground of ineffective assistance of counsel. Specifically, Defendant alleges the following:

1. Trial counsel rendered ineffective assistance when they provided Defendant with "poorly considered advice," which caused Defendant to reject the government's June 18, 2013, plea offer;

2. Trial counsel rendered ineffective assistance when Gedrose failed to move to withdraw from representing Defendant and Shipsey failed to ask Gedrose to withdraw and/or failed to move to have Gedrose relieved after Gedrose suffered "increasingly severe health problems";[1]

---

[1] The Court notes Gedrose died September 29, 2016, two years after the Court sentenced Defendant.

3. Trial counsel rendered ineffective assistance when they failed "to alert the Court to the government's consistently late and slow production of discovery early enough that the Court could impose a remedy without unduly delaying trial";

4. Trial counsel rendered ineffective assistance when they failed to object to or to rebut the trial testimony of Misty Losinger, the victim, who testified "Defendant had previously profited from her prostitution as a minor";

5. Shipsey rendered ineffective assistance when she called Brandon Cartwright-Erricho as a witness for the defense;

6. Trial counsel rendered ineffective assistance when they failed "to reapproach the prosecution to resume settlement discussions once they saw that trial was not going well for" Defendant;

7. Trial counsel rendered ineffective assistance when they failed to request a jury instruction on Count 1 "that would have held the government to its true burden of proof";

8. Gedrose rendered ineffective assistance when he "deviat[ed] dramatically from the closing argument plan that [the] defense team had prepared";

9.  Shipsey rendered ineffective assistance when she left
    the courtroom and did not return during Gedrose's
    closing argument;

10. Trial counsel rendered ineffective assistance when they
    failed to object "to the restraint enhancement imposed
    on [Defendant] under U.S. Sentencing Guidelines
    §3A1.3"; and

11. Gedrose rendered ineffective assistance when he advised
    Defendant not to testify even though Shipsey told the
    jury in her opening statement that Defendant would
    testify.

**A.  Rejection of the June 18, 2013, Plea Offer**

Defendant asserts trial counsel rendered ineffective
assistance when they provided Defendant with "poorly considered
advice," which caused Defendant to reject the government's
June 18, 2013, plea offer.

Defendant concedes in his Declaration that Shipsey "did
urge [him] to accept the 139-month offer," but he rejected it
because he

> was laboring under the erroneous belief, which I
> developed based on my communications with my
> attorneys, that to prove a violation of 18 U.S.C.
> § 1591 the government would have to prove beyond a
> reasonable doubt both that force was actually used
> against the victim and that serious injury
> resulted.  I did not believe, based on my
> discussions of the evidence with my attorneys,
> that the government would be able to prove that I
> had actually used force against Misty Losinger in

> order to get her to work as a prostitute. My
> attorneys did not adequately explain the
> significance of the *United States v. Todd* decision
> interpreting 18 U.S.C. § 1591 to me. They also
> did not adequately explain to me how my previous
> state court conviction would be used by the
> government to prove my *mens rea* and pattern of
> conduct in this trial.

Decl. of Christopher Graham at ¶ 6. In her Declaration Shipsey
states:

> I presented client with the [June 2013] offer,
> highlighting several important issues. One, he
> had a significant prior conviction for the same
> type of behavior where he received a ten year
> sentence. Second, in federal court he was charged
> with a crime that carried a mandatory 15 year
> minimum and the government was willing to offer an
> amount below the minimum. Third, based on the
> investigation that had already been done, it
> appeared that the victim was cooperating
> extensively and would be prepared to testify
> against [Defendant]. At one point, [Defendant]
> felt that if I couldn't find the letter
> documenting negotiations between TO Hester and
> Mr. Ujifusa, then somehow he could use that for
> appeal. I explained to him very clearly, that he
> was being given a 10 year offer, it was a very
> reasonable settlement proposal and I felt strongly
> that he should take the deal. He did not wavier
> in declining the offer.

Shipsey Decl. at ¶ 1.

The record supports Shipsey's testimony that she
appreciated the fairness of the government's June 2013 offer in
light of Defendant's prior history, the fact that the victim
would be testifying, and her recognition that the offer was below
the minimum. There is not any indication in the record that
Shipsey failed to understand *Todd* or how Defendant's prior

conviction could be used to indicate his mental state as to the charges for which he was on trial. Finally, Defendant does not assert and there is not any indication in the record that Defendant would have taken the offer at the time it was extended. Instead the record reflects Defendant rejected this and similar offers three times in state and federal court. Numerous attorneys explained to Defendant all aspects of the charges against him as well as the evidence against him in both this matter and the state matter and Defendant still declined to accept the plea offer at any time.

On this record the Court, therefore, concludes trial counsel did not provide ineffective assistance with respect to advice as to the June 2013 plea offer.

**B.   Gedrose's Failure to Withdraw**

Defendant asserts trial counsel rendered ineffective assistance when Gedrose failed to move to withdraw from representing Defendant and Shipsey failed to ask Gedrose to withdraw and/or failed to move to have Gedrose relieved after Gedrose suffered "increasingly severe health problems." Defendant contends Gedrose's health problems interfered with trial preparation, review of the evidence, preparation of arguments, and defense team meetings.

As noted, Gedrose had heart surgery in August 2013 and entered a rehabilitation center. Defendant states in his

Declaration that Gedrose's

> failing health frequently limited my ability to
> have meaningful attorney-client contact with him
> . . . . I was very fond of Mr. Gedrose and wanted
> to believe that he could provide me with competent
> counsel and representation, but it became obvious
> to me that his health problems were causing him to
> become easily confused and forgetful.

Graham Decl. at ¶ 10. Defense investigator Eli Rosenblatt states
in his Declaration that although Gedrose "visited [Defendant]
alone on multiple occasions," Gedrose "did not seem to fully
understand some of the concepts that Ms. Shipsey and I discussed
during trial preparation and trial itself" and he "did not
complete all assigned trial preparation projects." Decl. of Eli
Rosenblatt at ¶¶ 4, 6-7.

Shipsey, however, testifies in her Declaration that
while Gedrose was in the rehabilitation center he asked Shipsey
to send him "motions, research etc. regarding [Defendant's]
case." Shipsey Decl. at ¶ 2. Shipsey states:

> I visited [Gedrose] almost daily and we discussed
> the case. Although he appeared limited physically
> in terms of ability to engage in physical
> exercise, at that time it did not appear to me
> that he had any cognitive limitations. After
> Mr. Gedrose returned home, he had a few medical
> setbacks, having to return for additional
> medication [*sic*] attention. I asked on several
> occasions if he felt he was ok to work with me on
> [Defendant's case]. He indicated that he was able
> to do so in part because he had a fairly limited
> caseload at the public defenders office because he
> was coming back from a medical leave.
> Additionally, Mr. Gedrose and I met together with
> [Defendant] to talk to him about the situation.
> [Defendant] was very comfortable with Mr. Gedrose
> and wanted him to continue.

Shipsey Decl. at ¶ 2.

At Defendant's detention hearing on January 13, 2014, Shipsey requested the Court to allow Defendant to be temporarily released because Gedrose was not able to go into the correctional facility on doctor's orders due to the risk of infection. The Court, however, suggested Defendant be made available in the Courthouse detention area to meet with counsel and questioned the need for both attorneys to meet with Defendant to prepare for trial. The Court noted "[it doesn't take two lawyers to prepare a client for trial, simultaneously. . . . [It's a fallacious assumption that both of you need to meet with him for all trial preparation." Jan. 13, 2014, Detention Hearing Tr. at 34-36. The Court denied Defendant's request to be temporarily released from detention and noted Defendant "has two competent trial attorneys." *Id*. at 61. The Court directed the government, defense counsel, and the Marshal's Service to work as needed within reason to assist Gedrose in meeting with Defendant to prepare for trial at the Courthouse. *Id*. at 67.

On this record the Court concludes Defendant has not established that either Gedrose's failure to withdraw or Shipsey's failure to ask Gedrose to withdraw is an error "so serious that [defense counsel's] performance fell below an objective standard of reasonableness under prevailing professional norms." *Mak*, 970 F.2d at 618. Accordingly, Defendant has not satisfied the deficient-performance prong of

14 – OPINION AND ORDER

*Strickland*.

Even if the Court found Gedrose was unable to adequately assist in the defense of Defendant, the Court concludes Defendant fails to establish that he suffered prejudice. At all relevant times Defendant had at least one experienced defense attorney representing him in this matter and usually two. Nowhere in the record is there any evidence that Gedrose's presence in the case, even with his health challenges, harmed Defendant. On this record the Court, therefore, concludes trial counsel did not provide ineffective assistance when Gedrose did not withdraw and/or Shipsey did not request to have Gedrose removed as counsel.

### C.   Discovery Issues

Defendant asserts trial counsel rendered ineffective assistance when they failed "to alert the Court to the government's consistently late and slow production of discovery early enough that the Court could impose a remedy without unduly delaying trial." The record, however, does not support Defendant's assertion. The record reflects Shipsey and Gedrose frequently brought to the Court's attention issues with the government's late discovery. The Court heard and addressed those issues in multiple pretrial conferences. For example, on February 25, 2014, the Court held a hearing because it had received an email from Gedrose in which he expressed "serious concern over the state of discovery" and requested to continue

the trial date. Feb. 25, 2014, Hearing Tr. at 3. Gedrose stated
at the hearing that the "discovery seems to be coming in,
sometimes in dribs and drabs, sometimes what would almost -- at
least in my mind -- be a document dump." *Id*. at 5. Gedrose
advised the Court that defense counsel "simply doesn't] have the
resources or the time between now and the trial date of Monday,
March 3rd, to get all of this under control, to investigate what
needs to be done. Some of those reports are first impressions
that we have not had, or any reference to, in the past." *Id*.
Both Gedrose and Shipsey thoroughly detailed the discovery issues
and requested a continuance. The Court, however, declined to
continue the trial date.

On February 27, 2014, the Court held a pretrial
conference and noted Defendant's oral motion to dismiss or, in
the alternative, to continue trial based on a "recent discovery
violation." Feb. 27, 2014, Hearing Tr. at 4. Shipsey detailed
new and additional discovery issues and argued the discovery
issues prejudiced the defense to the extent that either dismissal
of the matter or continuance of the trial was required. The
Court found a brief continuance was merited and moved the start
of trial to accommodate defense counsel's need to evaluate new
evidence.

On March 4, 2014, the Court held a continued pretrial
conference at which Shipsey detailed another issue with late
discovery and defense counsel's difficult position with

attempting to process and to evaluate the late discovery. Shipsey again asked the Court to dismiss the case or to grant a continuance on the ground that "it is unjust to make us continue in the face of these continued, repeated violations." Mar. 4, 2014, Hearing Tr. at 13. The Court declined to continue the trial or to dismiss the matter.

The record reflects trial counsel repeatedly and thoroughly brought to the Court's attention issues with late or slow production of discovery as soon as the alleged violations became apparent. Trial counsel also consistently requested dismissal of the matter or a continuance of the trial.

On this record the Court concludes trial counsel did not fail "to alert the Court to the government's consistently late and slow production of discovery," and, therefore, trial counsel did not provide ineffective assistance related to alleged discovery improprieties.

### D. Victim Testimony

Defendant alleges trial counsel rendered ineffective assistance when they failed to object to or to rebut Misty Losinger's trial testimony "that Defendant had previously profited from her prostitution as a minor." Specifically, Defendant notes trial counsel failed to object when DDA Ujifusa stated in the government's opening statement that Losinger would testify "about . . . meeting the defendant . . . when she was still a minor." Trial Tr. at 280. Defendant asserts the

government elicited testimony from Losinger "from which the jury could have concluded that" DDA Ujifusa's representation in opening statement "was correct." Defendant asserts trial counsel was ineffective when they failed to address Losinger's testimony and to clarify that even though Defendant may have met Losinger when she was a minor, he did not "traffic" Losinger when she was under the age of 18. Defendant asserts the implication that Defendant trafficked Losinger when she was a minor was "inflammatory," and there is "a reasonable probability that jurors who might otherwise not have voted to convict defendant changed their votes because the thought of defendant profiting from the prostitution earnings of a minor was so repugnant."

      The record, however, does not reflect DDA Ujifusa or Losinger asserted Defendant prostituted Losinger when she was a minor. Losinger testified she was first trafficked by a third party, S.W., when Losinger was 16. Losinger stated she worked with S.W. from age 16-18. Losinger noted S.W. introduced her to Defendant in the late 1990s when Losinger was 16, at which time Defendant was trafficking another woman, Angie Lee. Although Defendant and S.W. would occasionally send Lee and Losinger on calls together, Losinger was working solely for S.W. Losinger noted she got back into contact with Defendant in 2009 when Losinger was 29 or 30. Losinger made it clear that Defendant trafficked her for approximately ten months in 2010 and did not pimp her until she was at least 29.

18 - OPINION AND ORDER

On this record the Court concludes trial counsel did
not provide ineffective assistance when they failed to object to
or to rebut Misty Losinger's trial testimony related to her age
when she met Defendant and when he trafficked her.

**E.    Witness Brandon Cartwright-Erricho's Testimony**

Defendant asserts trial counsel rendered ineffective
assistance when they called Brandon Cartwright-Erricho,
Defendant's son, as a witness for the defense.

The factual basis of the two counts of witness
tampering involved calls that Defendant made to Cartwright-
Erricho and others from jail.  Specifically, the government
alleged Defendant spoke in code in those telephone calls as part
of an attempt to keep Losinger from testifying at trial.
According to the government, when Defendant referred to "my
lawyer" in those telephone conversations, he meant Losinger.
Thus, when Defendant asked Cartwright-Erricho to ask "my lawyer"
how much money it would take to make "this all go away," the
government contended Defendant was asking Cartwright-Erricho to
find out how much money it would take to ensure that Losinger did
not testify at trial.

In her Declaration Shipsey testifies she called
Cartwright-Erricho as a necessary witness because he could tell
the jury that Defendant was not speaking in code during the
telephone conversations; because he could tell the jury that
Defendant was actually asking Cartwright-Erricho to consult his

19 - OPINION AND ORDER

attorney; and to "provide context to the conversations and hopefully demonstrate to the jury that [Defendant] was not talking in code, but rather wanted his family members to take care of his financial matters."  Shipsey Decl. at ¶ 5.

Some of Cartwright-Erricho's testimony, however, was potentially harmful to Defendant, including that he knew Defendant was helping Losinger to work as a prostitute and that Defendant got angry with and yelled at Cartwright-Erricho. Nevertheless, Shipsey's trial strategy was not constitutionally unsound.  As noted, the record reflects the government introduced transcripts of the recorded telephone conversations and asserted Defendant was actually talking in code in an effort to prevent Losinger from testifying, and Shipsey attempted to rebut those assertions through Cartwright-Erricho's testimony.  In addition, Cartwright-Erricho's testimony provided some assistance to Defendant.  For example, Cartwright-Erricho testified he observed Defendant's relationship with Losinger appeared to be more like that of a boyfriend and girlfriend rather than that of pimp and prostitute and that Defendant did not force Losinger to engage in prostitution.

Almost all lay witnesses come with pluses and minuses. The job of an attorney, and the core tactical decision, is to weigh the advantages and disadvantages and do all you can to enhance the one and minimize the other.  On this record the Court concludes Shipsey did not provide ineffective assistance when she

mad the quintessentially tactical decision to call Cartwright-Erricho as a defense witness at trial.

**F.    Failure to Reapproach the Prosecution to Resume Settlement Discussions**

Defendant alleges trial counsel rendered ineffective assistance when they failed "to reapproach the prosecution to resume settlement discussions once they saw that trial was not going well for" Defendant. Specifically, Defendant concedes in his Declaration that he rejected the various plea offers presented to him by the prosecution before trial, but he asserts he did so based on an inaccurate understanding of the law. Defendant states in his Declaration:

> During my trial, I told Ms. Shipsey that the case was not going well for me and directed her to resume plea negotiations with the government immediately. At that point, I had reconciled myself with the 139-month offer, and frankly I would have taken a significantly worse offer as long as it was also significantly better than the probable outcome of losing the trial. Ms. Shipsey flatly told me that the government would not make a plea agreement mid-trial. She never told me anything from which I could conclude that she actually asked either of the trial prosecutors, Mr. Ujifusa or Leah Bolstad, about their willingness to settle the case during trial.

Graham Decl. at ¶ 8. Shipsey states in her Declaration:

> I do not recall going to the prosecution to resume negotiations. [Defendant] was adamant prior to trial that he would not take a ten year offer. By the time we began trial, there was no way the government was going to go below the mandatory minimum. I would note that [Defendant] never gave me any indication, at any time, that he would be willing to plea [*sic*] out to 15 years or more. In fact, I do not believe that [Defendant] ever

> requested that I seek an offer from the
> government.

Shipsey Decl. at ¶ 7.

There is not any indication in the record aside from Defendant's Declaration prepared after conviction that he would have taken a 139-month offer or any other offer from the prosecution. In addition, the government notes in its Response that "there was no way the government would make an offer for time below the 15-year mandatory minium" mid-trial, especially in light of the way the trial was going.

Moreover, Shipsey testifies in her Declaration that she explained to Defendant on every occasion that the plea offer made by the government was a "very reasonable settlement proposal" and that she provided Defendant with the factual and legal reasons as to why it was a good offer. Shipsey urged Defendant to take the plea offers, but he consistently declined to do so.

On this record the Court concludes trial counsel did not provide ineffective assistance when they failed "to reapproach the prosecution to resume settlement discussions once they saw that trial was not going well for" Defendant.

## G. **Jury Instruction on Count 1**

Defendant alleges trial counsel rendered ineffective assistance when they failed to request a jury instruction on Count 1 "that would have held the government to its true burden of proof."

With respect to Count 1, the Court instructed the jury that the government must prove beyond a reasonable doubt that "Defendant knowingly recruited, enticed, harbored, transported, provided, or obtained Misty Losinger; [and] . . . Defendant did so knowing that threats of force, force, fraud or coercion *would be used* to cause Misty Losinger to engage in a commercial sex act." Emphasis added. Defendant contends trial counsel were ineffective when they did not request the jury instruction to state the "Defendant did so knowing that threats of force, force, fraud or coercion *actually were used* to cause Misty Losinger to engage in a commercial sex act." Emphasis in original.

Defendant does not cite any legal authority to support his position that his version was more legally correct. In addition, Defendant cannot show prejudice from trial counsel's alleged ineffective assistance in this regard because substantial evidence was before the jury from which it could have concluded Defendant actually used force, threats of force, and coercion against Losinger to cause her to engage in a commercial sex act. For example, Losinger testified Defendant hit her with telephone books, broke her back, beat her with high-heeled shoes in a pillow case, and showed her a hole in the ground and told her it was her grave. Losinger stated she feared if she failed to make her quota, Defendant would assault her.

On this record the Court concludes trial counsel did not provide ineffective assistance when they failed to request Defendant's suggested jury instruction on Count 1.

## H.    Deviation During Closing Argument

Defendant asserts Gedrose rendered ineffective assistance when he "deviat[ed] dramatically from the closing argument plan that [the] defense team had prepared."  Defendant asserts Gedrose's closing argument was disjointed, rambling, inconsistent, and occasionally out of chronological order. Defendant also asserts Gedrose failed to explicitly call Losinger's credibility into question by using the words "credible" or "credibility."  In addition, according to Defendant, Gedrose also failed to use the term "reasonable doubt" and omitted a number of concepts he was supposed to cover.

Shipsey states in her Declaration:

> Mr. Gedrose deviated greatly from the planned
> closing argument and failed to use a powerpoint
> presentation that I prepared.  Although I would
> have preferred it if the powerpoint had been used,
> Mr. Gedrose had prepared his own outline that did
> not rely on technology.  Mr. Gedrose felt that
> because he was not adept at using technology, he
> would be more comfortable with a strictly oral
> presentation.  Although this is not the way I
> would have done it, I deferred to Mr. Gedrose who
> had been a successful litigation attorney for over
> 40 years.

Shipsey Decl. at ¶ 9.

The record reflects Gedrose backtracked while covering various points in his closing argument and occasionally lost his

place in his notes. Nevertheless, he pointed out to the jury that the force, intimidation, or coercion elements that the government was required to prove depended solely on the testimony of Losinger. Although Gedrose did not use the word credibility specifically, he challenged Losinger's credibility by noting that the evidence reflected no one saw any bruises on Losinger or saw her hurt or upset. Gedrose noted even though Losinger testified she had to give Defendant all of the money from her prostitution and she was not able to go anywhere, she had a checking account and a debit card, she traveled out of state, she put funds into the checking account, and she withdrew money from the account. Gedrose noted although Losinger testified Defendant forced her to prostitute herself, there was evidence that Losinger had called Amanda Cooper and asked to work in prostitution with her. Gedrose also highlighted the fact that Losinger was a poor historian and could not remember how old she was when her son was born. In addition, Gedrose addressed Losinger's testimony that she was "turning her life around" by pointing out that Losinger presented at the hospital in 2013 in a "highly intoxicated state."

The Supreme Court has noted:

> Although courts may not indulge [in] *post hoc* rationalization for counsel's decision making that contradicts the available evidence of counsel's actions, neither may they insist counsel confirm every aspect of the strategic basis for his or her actions. There is a strong presumption that counsel's attention to certain issues to the

> exclusion of others reflects trial tactics rather
> than sheer neglect.  After an adverse verdict at
> trial even the most experienced counsel may find
> it difficult to resist asking whether a different
> strategy might have been better, and, in the
> course of that reflection, to magnify their own
> responsibility for an unfavorable outcome.
> *Strickland*, however, calls for an inquiry into the
> objective reasonableness of counsel's performance,
> not counsel's subjective state of mind.  466 U.S.,
> at 688.

*Harrington v. Richter*, 131 S. Ct. 770, 790 (2011)(quotations

omitted).  Although "it is always possible with hindsight to find

that counsel could have performed better during closing

arguments, it does not follow that counsel's conduct was

unreasonable."  *Velasquez v. Frauenheim*, No. 1:12-cv-01326 AWI

MJS (HC), 2014 WL 4354664, at *18 (E.D. Cal. Sept. 2, 2014).

Here the Court finds the arguments in Gedrose's closing

argument were reasonable and did not fall below the standards of

professional conduct.  Gedrose presented an argument which, if

believed, could have caused the jury to find Defendant not

guilty.  Accordingly, the Court concludes Gedrose did not provide

ineffective assistance when he deviated from the closing-argument

plan that Shipsey had prepared.

### I.   Shipsey's Departure from the Courtroom

Defendant asserts Shipsey rendered ineffective

assistance when she left the courtroom and did not return during

Gedrose's closing argument.  Specifically, Defendant asserts this

caused the jury to believe Shipsey "had lost faith in his case."

Shipsey states in her Declaration that she does not

> recall the exact moment that I left the courtroom
> but I believe it was in response to a family
> member who became distraught, leaving the
> courtroom. I believe I went out to console the
> family member. I did not come back into the
> courtroom because it was clear that Mr. Gedrose
> was going off script and several times appeared to
> be frustrated. I was not able to offer any help
> in that situation. I was not looked at as lead
> counsel. In the eye of the jury, I believe we
> were co-counsel. Throughout the trial, there were
> times that one of us would leave the courtroom, to
> prepare a witness etc. So, I don't believe this
> was out of the ordinary.

Shipsey Decl. at ¶ 10.

As Shipsey notes, it was not unusual for her or Gedrose
to step out of the courtroom during the trial to address an
issue, to prepare a witness, or for other reasons. Gedrose was
conducting closing argument alone. It was not contemplated that
Shipsey would give any part of the closing argument or
participate in closing argument. The Court, therefore, finds it
unlikely that the jury viewed Shipsey's departure while Gedrose
was conducting closing argument as an abandonment of Defendant or
an indication that Shipsey had lost faith in Defendant's case.

On this record the Court concludes Shipsey did not
provide ineffective assistance when she left the courtroom and
did not return during Gedrose's closing argument.

**J.    Objection to the Restraint Enhancement**

Defendant asserts Defendant alleges Shipsey rendered
ineffective assistance when she failed to object "to the

restraint enhancement imposed on [Defendant] under U.S.
Sentencing Guidelines § 3A1.3."

United States Sentencing Guidelines (U.S.S.G.) § 3A1.3
provides: "If a victim was physically restrained in the course
of the offense, increase by 2 levels." The record reflects
Shipsey objected to the application of this 2-level enhancement
in Defendant's objections to the Presentence Report.
Specifically, Shipsey objected to the sufficiency of the evidence
used to support the enhancement on the ground that it relied on
"false statements" by Losinger. The Court addressed Shipsey's
objection at the sentencing hearing and stated: "Well, I was
present during the trial and had a more than sufficient
opportunity to evaluate all of the witnesses, including Ms.
Losinger. I find her testimony credible." Sentencing Hearing
Tr. at 23-24. The Court, therefore, imposed the 2-level
enhancement.

Defendant asserted on appeal that the Court erred when
it applied the enhancement because it resulted in improper
"double counting." Although the Ninth Circuit affirmed the
application of the enhancement, Defendant asserts in his Motion
to Vacate that "[b]ecause Ms. Shipsey . . . did not frame [the]
objection [to the enhancement] as an objection to a *legal* error,
defendant's appellate counsel was forced to argue the unpreserved
issue as a matter of plain error." Def.'s Reply at 25 (emphasis
in original). The Ninth Circuit, however, made clear that

Defendant's arguments, both factual and legal, were unavailing:

> Section 3A1.3 calls for a two-level increase "[i]f a victim was physically restrained in the course of the offense."  Under the Guidelines, the term " '[p]hysically restrained' means the forcible restraint of the victim such as by being tied, bound, or locked up."  U.S.S.G. § 1B1.1 cmt. n.1(K).  The jury heard evidence that Graham locked his victim in the trunk of his car and drove her to a location in order to coerce her into engaging in further commercial sex activity.  Such restraint was not necessary to the application of U.S.S.G. § 2G1.1, which sets a Base Offense Level of 34 for Graham's offense of conviction, sex trafficking accomplished by force, fraud, or coercion under 18 U.S.C. § 1591(b)(1).  The two guidelines thus serve distinct purposes.  There was no improper double counting.  *See United States v. Smith*, 719 F.3d 1120, 1125 (9th Cir. 2013); *see also* U.S.S.G. § 3A1.3 cmt. n.2.

*United States v. Graham*, 644 F. App'x 795, 795-96 (9th Cir. 2016).

On this record the Court concludes Shipsey did not provide ineffective assistance in her objection to the restraint enhancement under U.S.S.G. § 3A1.3.

**K.    Advice not to Testify at Trial**

Defendant asserts Gedrose rendered ineffective assistance when he advised Defendant mid-trial not to testify even though Shipsey had told the jury in her opening statement that Defendant would testify.

It is undisputed on this record that at the time defense counsel was preparing for trial and at the beginning of trial Defendant planned to testify and defense counsel supported

that decision. Accordingly, in her opening statement Shipsey indicated a number of times that Defendant would testify. Specifically, she stated:

> Now, I expect that in a few days Mr. Grahams's [*sic*] going to sit up here in this witness stand. And expect he's going to be nervous, like we all are when we're in court.
>
> But in a strange way, he's excited to be able to finally tell his side of the story. It's pretty hard for him to sit here and hear the Government, hear all of those things just put before him, because there is a very different side of the story. And I hope you will give him the decent chance to listen to all of those -- all of his explanations. And I know you will.
>
> So let me start out by telling you who Mr. Graham was back in 1998, 1999; who he was in 2010. Because those are two very different people.
>
> Mr. Graham is going to tell you that back in 1998 he was an alcoholic. He was riddled with a cocaine addiction. He had no job. No legitimate source of income. And so he did become a pimp. He used force and fraud on Angie Lee, and he compelled her to prostitute. And it was a horrible time in Mr. Grahams's life.
>
> * * *
>
> Certainly the defense position -- and you'll hear Mr. Graham talk about this -- that [prostitution] was an activity that Ms. Losinger knowingly and willingly chose to do.
>
> With respect to Counts 2 and 3, Mr. Graham will tell you that his purpose in calling Mr. Cartwright, Mr. Elliott was only to find out what the charges were about. And that he never attempted in any way to stop her from coming to court. In fact, I expect you'll hear later that he wanted her to meet with authorities.

Trial Tr. at 296, 310.

Defendant explains in his Declaration that several days into trial

> Mr. Gedrose approached me to ask me in no
> uncertain terms to reconsider testifying.  He
> promised that if I did not testify, he and
> Ms. Shipsey would cover the needed evidentiary
> topics by other means and address them effectively
> in Mr. Gedrose's closing argument.  Ms. Shipsey
> disagreed with Mr. Gedrose's perspective about my
> testimony.  In reliance on Mr. Gedrose's legal
> advice, I decided not to testify in my own
> defense.

Graham Decl. at ¶ 14.  Shipsey states in her Declaration:

> I believe that Mr. Graham should have testified
> and clearly expressed that to Mr. Graham.  I
> worked with Mr. Graham on preparing him for trial
> and fully expected that he would do so.  Mid
> trial, Mr. Gedrose recommended that Mr. Graham not
> testify.  I strongly opposed this strategy, in
> part because I had already given the jury the
> impression that they would hear from Mr. Graham.
> During a lunch break, Mr. Gedrose and I went down
> to the marshal lock up to meet with Mr. Graham.
> We both gave our input to Mr. Graham.  Mr. Graham
> chose Mr. Gedrose's advice.  I continue to believe
> that was a bad decision.

Shipsey Decl. at ¶ 6.

In *Saesee v. McDonald* the Ninth Circuit held that the failure to have a defendant testify may satisfy the deficient-performance prong of *Strickland* when counsel has promised a defendant will do so.  725 F.3d 1045, 1050 (9th Cir. 2013).  The Ninth Circuit explained:

> A juror's impression is fragile.  It is shaped by
> his confidence in counsel's integrity.  When
> counsel promises a witness will testify, the juror
> expects to hear the testimony.  If the promised
> witness never takes the stand, the juror is left
> to wonder why.  The juror will naturally speculate

why the witness backed out, and whether the
absence of that witness leaves a gaping hole in
the defense theory. Having waited vigilantly for
the promised testimony, counting on it to verify
the defense theory, the juror may resolve his
confusion through negative inferences. In
addition to doubting the defense theory, the juror
may also doubt the credibility of counsel. By
failing to present promised testimony, counsel has
broken a pact between counsel and jury, in which
the juror promises to keep an open mind in return
for the counsel's submission of proof. When
counsel breaks that pact, he breaks also the
jury's trust in the client. Thus, in some cases
— particularly cases where the promised witness
was key to the defense theory of the case and
where the witness's absence goes unexplained — a
counsel's broken promise to produce the witness
may result in prejudice to the defendant.

*Id*. at 1049-50 (quotation omitted). Other circuits have reached

the same conclusion under similar facts. For example, in *Ouber*

*v. Guarino* the First Circuit noted:

It is apodictic that a defendant cannot be
compelled to testify in a criminal case . . . and
criminal juries routinely are admonished — as was
the jury here — not to draw an adverse inference
from a defendant's failure to testify. But . . .
[w]hen a jury is promised that it will hear the
defendant's story from the defendant's own lips,
and the defendant then reneges, common sense
suggests that the course of trial may be
profoundly altered. A broken promise of this
magnitude taints both the lawyer who vouchsafed it
and the client on whose behalf it was made.

293 F.3d 19, 28 (1st Cir. 2002). In that case the defendant did

not testify after counsel had promised in opening statement that

he would do so. The court noted "under ordinary circumstances" a

"defendant's decision about whether to invoke the right to remain

silent is a strategic choice, requiring a balancing of risks and

benefits." *Id.* Defense counsel, however, stated numerous times in opening statement that the defendant would testify, identified what the defendant would testify about, and then decided not to have the defendant testify. *Id.* The First Circuit declined to excuse counsel's decision as "a justified reaction to unfolding events." *Id.* at 29. The court noted:

> The theoretical underpinnings for this argument are sound: unexpected developments sometimes may warrant changes in previously announced trial strategies. But although we cannot fault counsel for not guarding against the unforeseeable, the case at hand does not fit that description. Here, everything went according to schedule; nothing occurred during the third trial that could have blindsided a reasonably competent attorney or
>
> justified a retreat from a promise previously made.

*Id.*

The Ninth Circuit, however, has also made clear that not all failures to produce promised witnesses constitute ineffective assistance of counsel. For example, in *Foster v. Oregon* the Ninth Circuit concluded defense counsel's failure to produce a promised witness did not constitute deficient performance. 587 F. App'x 356, 358 (9th Cir. 2014). In *Foster* the Ninth Circuit noted defense counsel was "faced with an unforseen trial development," which caused counsel to face "quite a dilemma - counsel could break their promise to the jury and risk losing the jury's trust, or counsel could call their expert to the stand anyway and risk detrimental testimony." *Id.*

Counsel made the tactical decision to break his promise made in opening statement. The Ninth Circuit concluded counsel's decision "in light of these unforeseen circumstances was a sound trial strategy" rather than deficient performance. *Id*.

The circumstances of this matter differ from those present in *Saesee* and *Ouber* in at least one critical respect. In *Saesee* and *Ouber* the defendants had only one attorney who initially recommended and/or promised that the defendant would testify and then who recommended to the defendant that he not testify. Here Defendant had two competent defense attorneys whose opinions as to whether he should testify diverged late in the trial. Defendant concedes in his Declaration that Shipsey continued to advise him to testify at trial because she had promised the jury that he would do so in her opening statement. Defendant does not testify that he believed Shipsey was incompetent or unable to provide him with adequate legal advice on the issue. Rather, Defendant explains in his Declaration:

> Because Gary Gedrose was a man rather than a woman and was significantly older than Ms. Shipsey, I respected and trusted him more as an attorney than I respected and trusted her. I thought the jury would be favorably impressed by Mr. Gedrose's appearance in court. Additionally, I worked more with Mr. Gedrose personally to prepare for trial, whereas Ms. Shipsey spent more time working with the investigator, witnesses, evidence, the preparation of legal documents, and courtroom work. As a result, I relied on Mr. Gedrose's advice in preference to Ms. Shipsey's whenever their advice diverged.

Graham Decl. at ¶ 9.  Defendant received conflicting advice from two competent counsel and ultimately made his decision based on that advice.  Although "a decision about whether to testify ultimately rests with the defendant, a defendant's waiver of the right to testify must be knowing, informed, and intelligent. This implies an understanding of the consequences of the decision."  *Ouber*, 293 F.3d at 31.  In *Ouber* "the affidavits of both the petitioner and . . . trial counsel ma[de] it clear that [the petitioner] was not informed about the potential impact that the broken promises might have on the jury should she decide not to testify."  *Id*.  Here, however, the record reflects Shipsey informed Defendant about the potential impact that his failure to testify might have on the jury, Shipsey advised Defendant that she believed failing to testify would be a mistake, and Defendant understood Shipsey's advice.  Defendant's decision, therefore, unlike the petitioner's decision in *Ouber*, was knowing, informed, and intelligent and made with an understanding of the consequences of the decision.

On this record the Court concludes Defendant has not established ineffective assistance of counsel when Gedrose advised Defendant mid-trial not to testify because Defendant was well-informed by Shipsey of the risk in declining to testify and his decision not to testify was knowing, informed, and intelligent.

## III. Evidentiary Hearing

Defendant moves in the alternative for an evidentiary hearing to support his Motion to Vacate or Correct Sentence.

An evidentiary hearing "is not automatically required on every section 2255 petition." *Baumann v. United States*, 692 F.2d 565, 570-71 (9th Cir. 1982). *See also United States v. Reyes-Bosque*, 624 F. App'x 529, 530 (9th Cir. 2015)(same). A hearing is not required when "the files and records conclusively show that the movant is not entitled to relief," *United States v. Mejia-Mesa*, 153 F.3d 925, 929 (9th Cir. 1998), or when the "record is sufficiently developed for the court to conclude that their claim lack[s] merit." *Joseph v. United States*, 583 F. App'x 830, 831 (9th Cir. 2014). "To earn the right to a hearing" the defendant must allege "specific facts which, if true, would entitle him to relief." *United States v. McMullen*, 98 F.3d 1155, 1159 (9th Cir. 1996). *See also United States v. Leonti*, 326 F.3d 1111, 1116 (9th Cir. 2003)(an evidentiary hearing is required only when "the movant has made specific factual allegations that, if true, state a claim on which relief could be granted") (internal quotation marks and citation omitted).

The Court finds the files and records in this matter conclusively establish Defendant is not entitled to relief and the record is sufficiently developed for the Court to conclude that Defendant's claims lack merit. Accordingly, the Court

denies Defendant's alternative request for and evidentiary hearing.

## CONCLUSION

For these reasons, the Court **DENIES** Defendant's Motion (#183) to Vacate, Set Aside, or Correct the Sentence Pursuant to 28 U.S.C. § 2255 and **DECLINES** to issue a certificate of appealability.

IT IS SO ORDERED.

DATED this 7th day of May, 2018.


/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Judge